UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MELANIE JOHNSON,

                Plaintiff,

v.                                          Case No.  5:05-cv-44-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income. (R. 46-49.) The Commissioner has answered (Doc. 9), and both parties have filed briefs outlining their respective positions. (Docs. 19 & 20.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for Supplemental Security Income on December 28, 2001, alleging an onset date of December 1, 2001. (R. 46-50.) Her claim was denied initially and upon reconsideration. (R. 38, 42.) Plaintiff requested a hearing before an Administrative Law Judge, which was held on February 13, 2004. On May 20, 2004, following the hearing, Administrative Law Judge Albert D. Tutera (the "ALJ") issued a decision unfavorable to Plaintiff. (R. 14-21.) Plaintiff's request for review of that decision was denied by the Appeals Council on September 16, 2004, rendering the ALJ's decision the final decision of the Commissioner. (R. 7.)

## II.  ISSUES PRESENTED

The Plaintiff raises primarily two issues on appeal. First, the Plaintiff contends that the ALJ erred in mechanically applying the Grids when the ALJ should have considered Plaintiff's use of a cane as a non-exertional impairment. The Plaintiff further takes issue with the fact that neither the ALJ nor the Appeals Council fulfilled their duty to develop the record because neither made any further inquiry about Plaintiff's use of a cane. Plaintiff submitted a letter to the Appeals Council stating that her treating physician, Dr. Hill, found Plaintiff disabled and that Plaintiff had a prescription for a wheelchair and a walker. Plaintiff now contends it was error for the Appeals Council not to request additional information from Dr. Hill on this issue when Plaintiff failed to submit the letter from Dr. Hill or her prescriptions. Second, Plaintiff asserts that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain pursuant to the Eleventh Circuit pain standard.

The Commissioner argues that  the ALJ did not err in relying solely on the Grids because Plaintiff failed to submit evidence (when she had the opportunity to do so) to support her claim that use of a cane resulted in a non-exertional impairment.  Further, the Commissioner contends that the Appeals Council did not fail to develop the record based on the letter Plaintiff submitted because the letter was not material evidence of Plaintiff's disability which would change the disposition of this case.

## III.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

---

[1] *See* 42 U.S.C. § 405(g) (2000).

than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff

---

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to

---

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such

---

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.")

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## IV. SUMMARY OF THE RECORD

### A. Personal and Occupational Background

Plaintiff, born on February 12, 1960, was forty-four years old at the time of the hearing before the ALJ. (R. 46, 19.) She completed high school and testified at the hearing that she attended Community College for a year and a half. (R. 84, 205.)[21] Plaintiff worked in the kitchen at the Oakwood Center and Mt. Dora Heath Care from 1979-1990. She worked for four years as a private sitter for elderly patients, and most recently worked as an assistant supervisor in the shoe department at Sears. (R. 62.)

As an assistant supervisor, Plaintiff supervised two to four other individuals and her job duties also entailed answering the phone and using a ladder to retrieve shoes for customers. On her Work History form (R. 63) Plaintiff noted that this job required her to spend six to eight hours a day on her feet. She frequently lifted objects weighing twenty-five pounds. (*Id.*) When Plaintiff worked as kitchen staff, her duties included cooking and washing dishes. She also spent about eight hours a day on her feet in this job. Plaintiff noted that she frequently lifted objects of twenty-five pounds, but the heaviest objects she lifted weighed 50 pounds. (R. 64, 66.) As a private sitter, she recorded her patients' medications and had to turn and lift patients. She noted that she

---

[20] *See id.*

[21]There is some inconsistency in the record as to the level of education Plaintiff obtained.  *See* R. 84, 205, 200.

spent the majority of the day walking, standing, and climbing, and may have occasionally assumed other postural positions. The heaviest objects she lifted were 100 pounds or more. (R. 65, 79.)

Plaintiff claimed disability due to chronic headaches, arthritis, and back problems. Her back problems were due to injury in an automobile accident in July of 2001.

## B.  Plaintiff's Use of an Assistive Device to Ambulate

Dr. Fernandes, a chiropractor, treated Plaintiff in 2000-2002 for back pain, neck pain, and headaches prior to, and as a result of, the accident.  He noted that she had trouble walking at times, and Plaintiff told him she bought a cane for ambulation. (R. 93-94, 101, 102, 111.) However, Dr. Fernandes noted improvement in Plaintiff's ability to walk thereafter.  (R. 97, 101.) Plaintiff noted on the forms she completed for the Florida Department of Health and the Social Security Administration in 2002 that she no longer visits with friends because she has to take a walker with her and she uses a cane.  (R. 55, 58, 69.)  On August 6, 2003, Dr. Hill noted that it had been five months since the diskectomy he performed on Plaintiff and she was beginning to "ambulate more without her walker." (R. 172.)

In February of 2004, Plaintiff was treated by Joanne M. Keller, ARNP. Ms. Keller noted that Patient complained that after "two unsuccessful back surgeries with Dr. Hill [she] is currently in a disabled condition with regard to her back injury." Plaintiff also claimed that she "ambulates with a quad cane at all times for support." (R. 178.) In a letter dated July 13, 2004 Plaintiff submitted to the Appeals Council, she asserted that she submitted a letter in December 2003 from her surgeon Dr. Hill which stated that she was permanently disabled. She claimed to have enclosed an updated letter from Dr. Hill

7

and copies of prescriptions for a motorized wheelchair and walker. (R. 200.) Notably, there are no such letters or prescriptions that are part of the record.

Plaintiff testified at the hearing that Dr. Hill prescribed the use of a cane to her. She also stated that she had a motorized chair that she could not afford and a wheelchair. (R. 206.) She testified that she uses the cane everyday and "can walk a little bit without it" if she is having a good day. She claimed, though, that she rarely walks without the cane because she also has osteoarthritis in her knees. She testified that the arthritis is in a "crippling" position and that she has discussed knee replacement because she "walk[s] like an 85 year-old woman." (R. 207.) She also testified that if her medication for her back pain was working she could walk about three blocks and then would need a minute to rest. However, she claimed that because of her knees walking is still very hard.  (R. 213.)

## C. Treatment and Extent of Plaintiff's Injuries and Pain

### 1. Objective findings

An MRI was performed on Plaintiff's back in September of 2001 which revealed a small right paramedian disc protrusion at L5-S1. (R. 166.) An MRI performed on September 24, 2002 reveled a status post right laminectomy at L4.  There was a mild enhancing scar in the region of the laminectomy and around the right L5 nerve root within the neural canal. There were also changes of mild degernative disc disease at L4-5. (R. 167.) There was no evidence of disc herniation or central or neural foraminal stenosis. (R. 168.) In January of 2003, prior to Plaintiff's second surgery, an MRI revealed L4-5 and L5-S1 disc bulging without significant spinal neural foraminal stenosis, nor significant scar tissue. (R. 176.) In August of 2003, Dr. Hill ordered another

MRI which showed an adequate decompression at the area where her surgery was performed, no evidence of significant scar tissue, but she continued to have bulging in her disc spaces. (R. 172.) Dr. Hill noted that Plaintiff had no new symptoms and only complained of "low grade dull backache." He recommended that Plaintiff again attend physical therapy, and noted that Plaintiff had reached maximum medical improvement at that time because there was nothing further he could do to treat her spine. (*Id.*)

An MRI of Plaintiff's knee performed on February 24, 2004 revealed "extensive soft tissue edema . . . a small joint effusion and fluid in the intercondylar notch and at the level of the knee" as well as "a subchondral cyst within the proximal tibia." However, all of her ligaments, tendons, and menisci were intact. (R. 196.) At her hearing prior to the MRI, Plaintiff testified that Joanne Keller, the nurse practitioner ordered the MRI due to the worsening of Plaintiff's arthritis. The results of the MRI would determine if she needed knee surgery.  No further medical evidence with respect to Plaintiff's knee is contained in the record.

### 2. Treatment For Back Pain by Dr. Fernandes, Dr. Hill, and ARNP Keller

Dr. Fernandes treated Plaintiff through 2000-2002.  (R. 88-115.) He diagnosed Plaintiff with a cervical sprain/strain and noted decreased lumbar range of motion and muscle spasms. (R. 89-90.) Plaintiff's treatment for back pain and injury included various combinations of the following therapies: chiropractic manipulations, use of an ultrasound, cryotherapy, epidural steroid injections when recommended by Plaintiff's treating physician Dr. Hill (R. 126), use of an EMS, application of heat or ice, hydromassage, and a topical analgesic. Dr. Fernandes usually noted Plaintiff's condition had improved or she was at least making acceptable progress.  Plaintiff visited Dr.

9

Fernandes every two to three days for treatment of her back, although as her condition improved toward the end of 2001 she was told she could return as needed. (R. 88-115.)

On October 26, 2001, Dr. Fernandes noted that Dr. Hill put Plaintiff on no-work status. (R. 94.) On October 29, 2001, he noted that while Plaintiff's symptoms had improved, she had some problems performing activities of daily living which aggravated her back. (R. 92.) No sensory loss was noted. (R. 97.)

Dr. Hill, Plaintiff's board certified neurosurgeon, performed an "uncomplicated microdiscectomy at L5-S1" in January of 2002 after more conservative treatment with epidural steroid injections failed to relieve her back pain from the car accident. (R. 128, 131, 132.) After the surgery, in February 2002, he recommended physical therapy and noted that her pain would decrease with time if there was irritation around the nerve root. (R. 127.) Plaintiff was in physical therapy from February of 2002 through February of 2003. (R. 141-165, 205.) When Plaintiff had continued pain in June of 2002, Dr. Hill recommended steroid injections. (R. 126.) In October of 2002, he referred her to a Dr. Young for a pain management evaluation. (R. 177.)

On January 30, 2003, Dr. Hill performed another microdiskectomy. (R. 169.) At a follow up visit he put Plaintiff on Bextra to control pain in an attempt to reduce her use of narcotic pain medication and asked her to return in four months for a follow up.

After the second surgery, Dr. Hill noted in July of 2003 that Plaintiff had the return of some leg and lower back pain, but that Plaintiff believed the physical therapy was helping her recover. Plaintiff had not yet returned to her normal level of activity. Dr. Hill noted that, overall, her condition had improved and that "she may always have to deal with some level of pain associated with her degenerative spine disease." He expressed

the intention to continue working with Plaintiff until she could conduct her activities of daily living without difficulty, but noted that "[h]er ability to do any type of strenuous work with lifting will be impaired because of her chronic back problem." He recommended Plaintiff use a Medrol dose pack. (R. 174.)

In February 2004 Plaintiff visited Joanne M. Keller, ARNP. The nurse practitioner noted that Plaintiff complained of pain in her lower back at the surgical site and in her knees. (R. 179, 182.) At that time, Plaintiff was advised to stay on her current pain medications, Soma, Celebrex, and Percocet. (R. 178-79.) Throughout the course of treatment Plaintiff was prescribed various pain medications and muscle relaxers such as Lortab, Valium, Percocet, Hydrocodone, Demorol, and Carisoprodol. (R. 30, 32, 52, 59, 178-185.)

### 3. Plaintiff's Testimony and Evidence from Completed Forms

Plaintiff testified that she has a cramping pain in her back everyday and that she takes her pain medication, but it does not give her complete relief. (R. 206, 71.) Plaintiff also testified that when she takes her pain medication it makes her feel "drugged up" and then "[she does not] even know what [she is] doing half of the time." (R. 210.) She also stated in forms submitted to the Florida Department of Health that her medications make her sleepy and interfere with her concentration. (R.55.) She testified that she would be a candidate for another back surgery, but she does not want to have another one performed. (R. 215.)

Plaintiff claimed that her doctor told her after her back surgery that it could be a year or longer before she felt better, although she may not fully recover. (R. 41.) She noted on the forms she submitted to the Florida Department of Health that she cannot

stand for very long or bend and someone helped her fix her meals, go shopping, perform household chores, and bathe. (R. 52-54, 71-72, 209.) Plaintiff testified that she cooks, but cannot clean or do laundry. (R. 210.) She testified that one of her doctors told her she should not drive because of her back. (R. 211.) She claimed that she can only sit for forty-five minutes or up to an hour, but needs help getting up after that point. (R. 52-54.) Plaintiff noted in the forms submitted to the Social Security Administration that she can only walk one block, cannot stand for more than twenty minutes and cannot bend nor lift anything. (R. 48.) Plaintiff testified to similar limitations at her hearing. (R. 205.)

Plaintiff testified that she spent most of the day sitting, reading, and watching television. She continued to volunteer with a cheerleading group once a week, organizing files. (R. 209-210.) She also testified that she tries to exercise, but due to problems walking and her pain medication, she does not exercise very often. (R. 210.) Plaintiff also noted that she is no longer active in any social groups but she did state that she plays piano in church and was a cheerleading coordinator. (R. 54, 209.)

**4. Residual Functional Capacity Assessment by agency physicians**

On March 25, 2002, Dr. Takach completed an RFC assessment of Plaintiff for the agency. He noted that she could lift twenty pounds occasionally, ten pounds frequently, stand/walk or sit for about six hours in an eight hour workday. She had unlimited push and pull abilities. He noted that based on his review of the records, Plaintiff had an uncomplicated microdisketomy in January of 2002 and began rehabilitation. She had no neuro-motor deficits, and though she had not reached MMI, it was reasonably expected that her functional limits would be as he described above. (R. 119.) He also noted that

12

Plaintiff was limited to only spending occasional amounts of time in any other postural positions other than standing or sitting. (R. 120.) Aside from avoiding moderate exposure to hazards, Dr. Takach did not note any other limitations. (R. 122.)

A second agency physician completed an RFC assessment in July of 2002. He made the same functional limitation findings as Dr. Takach, discussed above, except that he noted no limitations on Plaintiff's ability to assume any postural positions such as climbing, balancing, stooping, kneeling, crouching, or crawling. (R. 135.) He recommended Plaintiff be limited to light work (R. 138) and noted that she was undergoing physical therapy, had decreased ROM, but was expected to improve through January of 2003. (R. 134-135.)

## V. DISCUSSION

### A. Plaintiff's Non-Exertional Impairment

Plaintiff asserts that essentially the ALJ and the Appeals Council erred for the same reason: failure to consider Plaintiff's use of an assistive device to ambulate. With respect to the ALJ, Plaintiff contends that Plaintiff's use of a cane was a non-exertional manipulative limitation which would preclude the ALJ from automatically applying the Grids to determine if there was work in the national economy that Plaintiff could perform. With respect to the Appeals Council, the Plaintiff contends that when she claimed she had prescriptions from her doctor for a cane and a wheelchair, even though those prescriptions were not part of the record, the ALJ and the Appeals Council had a duty to develop the record by requesting this information from Dr. Hill, Plaintiff's treating physician. The Commissioner asserts that despite numerous opportunities to review the record and submit additional evidence, Plaintiff failed to submit this additional evidence

from her doctor. Thus, according to the Commissioner, she did not prove that she needed a cane, nor that she was restricted in her ability to walk beyond the limitations the ALJ determined.

The burden is on the Plaintiff to prove her disability.[22] The ALJ and the Appeals Council gave Plaintiff, who was represented by counsel, the opportunity to submit additional evidence into the record on numerous occasions. Although Plaintiff submitted additional evidence (R. 34, 24, 10, 200-01, 196-197, 216) Plaintiff failed to submit the evidence from Dr. Hill that Plaintiff claims stated that she was disabled and included prescriptions for use of a cane and motorized wheelchair. Where evidence is not needed for their determination , neither the ALJ nor the Appeals Council, have a duty to act as Plaintiff's counsel or request evidence the Plaintiff has failed to submit.[23]

Moreover, the Court does not need to decide if the letter Plaintiff sent to the Appeals Council meets the Falge standards because the letter is not substantive evidence which would affect the outcome of Plaintiff's case. Plaintiff had multiple opportunities to submit additional evidence, and if the evidence was available during the administrative proceeding, it should have been submitted at that time. While a Social Security proceeding is not an adversarial proceeding, the Plaintiff, nonetheless, has the burden to prove she is disabled. Despite having been afforded an opportunity to do so, no evidence of the need for an assistive device was submitted to the ALJ, the Appeals Council, or for that matter, to this Court.

---

[22] See 20 C.F.R. § 404.1512; Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).

[23] Smith v. Schweiker, 677 F.2d 826, 829 (11th Cir. 1982).

Where the substantial evidence of record does not show that Plaintiff suffers from a non-exertional impairment, the ALJ does not have to take such an impairment into consideration and would not be precluded from using the Grids. In this case, neither the ALJ nor the Appeals Council erred in failing to consider Plaintiff's use of a cane because there was not substantial evidence in the record to support Plaintiff's claim. Plaintiff testified that on good days, when her back pain was controlled, she could walk without the cane unless her knees were bothering her. Dr. Fernandes, Plaintiff's chiropractor, noted that Plaintiff had trouble walking sometimes, had a limp, and on only one occasion that Plaintiff had purchased a cane.  However, he also noted that Plaintiff's ability to ambulate continued to improve over the course of treatment. While recuperating from her surgery in 2003, Dr. Hill noted that Plaintiff had to use a walker, but was beginning to "ambulate more without her walker."  He expected that Plaintiff would always have some pain associated with her back, but that she would be able to return to living fairly independently. His only limitation on physical ability was that she could not engage in strenous work which required lifting. No mention was made of the need for a cane or sustained or permanent  impairment in her ability to ambulate. Joanne Keller, ARNP, noted that Plaintiff told her she ambulated with a cane for support. However, no mention was made in any of the clinical notes from Ms. Keller that Plaintiff needed a cane or other assistive device, nor did she provide any treatment beyond recommending Plaintiff continue taking her prescribed pain medication.

Such minimal evidence in the clinical notes of three of Plaintiff's treating medical practitioners does little to support her claim that she needed a cane or other assistive device to walk. The ALJ is required to base his opinion on the substantial evidence in the

record before him. When the Plaintiff is given multiple opportunities to supplement that record, the ALJ has no duty to develop the record further, particularly where there is substantial evidence to support the ALJ's disability determination. Accordingly, the Court concludes that the ALJ did not err in using the Grids because Plaintiff failed to prove that she had a severe non-exertional impairment.

**B. <u>Subjective Complaints of Pain</u>**

Plaintiff claims that the ALJ did not properly evaluate her subjective complaints of pain. The ALJ must "consider a claimant's subjective testimony of pain if he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of such a severity that it reasonably can be expected to give rise to the alleged pain.[24] The ALJ may reject the plaintiff's subjective pain testimony, but the decision must be supported by substantial evidence.[25] Moreover, if the ALJ rejects a claimant's testimony of pain on credibility grounds, the ALJ must discredit it explicitly, and articulate the reasons for doing so.[26]

In this case, the ALJ claimed that pursuant to the pain standard he found that "claimant has a severe impairment that can be reasonably expected to produce pain . . . but the complaints suggest a greater severity of impairment than can be shown by the objective medical evidence alone." (R. 18.) The ALJ gave explicit reasons for his finding, and contrary to the assertions by the Plaintiff, the ALJ did not rely solely on Plaintiff's

---

[24] Foote, 67 F.3d at 1560.

[25] *Id.*

[26] Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

ability to perform everyday activities in making his determination. In his opinion, the ALJ documented much of the medical evidence which supported his finding that Plaintiff's complaints of pain could not be as limiting as she claimed.

Although Plaintiff had two surgeries due to back problems from an automobile accident in July of 2001, she was treated conservatively for her pain with physical therapy and pain medication that had minimal side effects. She was also at times treated with epidural steroid injections, heat, and muscle stimulation. The various MRIs performed throughout the course of Plaintiff's treatment revealed only mild degenerative disc disease without herniation and disc bulge without stenosis. Although the MRI of Plaintiff's knee revealed fluid and a possible cyst, the ligaments, tendons, and menisci were all normal. The treatment Plaintiff received alleviated some, though not all of the pain, and she testified that she was able to read, watch television, cook, and do volunteer work once a week, organizing files for a local cheerleading group. She also testified that she tried to exercise.

Dr. Hill noted that he referred Plaintiff to a Dr. Young for pain management, but there are no records revealing whether Plaintiff sought treatment from Dr. Young. In 2003, Dr. Hill noted that atough he told Plaintiff she would always have some level of pain, he expected her to be able to conduct her activities of daily living without difficulty. Dr. Hill described limitations on Plaintiff's ability to lift, but made no other mention of further physical restrictions. Based on the substantial evidence in the record, the ALJ properly applied the pain standard and found that the medical evidence did not support Plaintiff's claims as to the severity of her pain, nor were her conditions of such severity

that they could give rise to such disabling pain. As a result, the ALJ did not err by discrediting Plaintiff's subjective complaints of pain.

## VI.  <u>CONCLUSION</u>

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 13, 2006.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel